Filed 12/21/21  P. v. Cerda CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MACARIO VASQUEZ CERDA,<br><br>Defendant and Appellant. | F078741<br><br>(Super. Ct. No. VCF303351)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Kathryn T. Montejano, Judge.

Audrey R. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Angelo S. Edralin, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted appellant Macario Vasquez Cerda of 12 felonies, including forcible rape, kidnapping to commit rape, and forcible lewd acts upon a child. Two victims were involved, and both were minors when some of these crimes occurred. Appellant received a determinate prison sentence of 11 years, and a consecutive indeterminate prison sentence of 340 years to life, plus 50 years.

Appellant raises claims of insufficiency of the evidence, instructional and sentencing errors, and prosecutorial misconduct. We reject a vast majority of his claims. However, we agree with appellant that his sentence in count 4 (making criminal threats) must be stayed pursuant to Penal Code section 654 because those threats were the means of accomplishing the forcible rape in count 1.[1] We remand this matter for resentencing but otherwise affirm the judgment.

## BACKGROUND

Appellant sexually assaulted two victims in this matter, E.G. and C.G. Their mother, Yolanda M., was in a romantic relationship with appellant from 2008 to 2011. Yolanda and appellant's relationship ended following an incident of domestic violence in 2011.[2] Appellant and Yolanda have two children together.

Appellant moved in with Yolanda and her family after they started dating. Yolanda told the jury that she never knew that appellant was having an inappropriate relationship with either E.G. or C.G. Prior to February 26, 2013, neither E.G. nor C.G. disclosed to Yolanda that appellant was sexually assaulting them.

---

[1] All future statutory references are to the Penal Code unless otherwise noted.

[2] We summarize the 2011 incident of domestic violence in greater detail later in this opinion.

We summarize the material trial facts supporting appellant's judgment, and we summarize the jury's verdicts. We provide additional facts later in this opinion when relevant to the issues raised.

## I. Appellant's Criminal Acts With E.G.

E.G., who was born in April 1993, was 25 years old at trial. She informed the jury that appellant was her mother's ex-boyfriend. E.G. testified that appellant sexually assaulted her numerous times.

### A. Appellant's first sexual assault of E.G. (an uncharged incident).

According to E.G., the first incident with appellant occurred in 2009 just before her junior year of high school. She was 16 years old.

Around 9:00 p.m. to 10:00 p.m. on the night in question, appellant was alone with her in the garage. Everyone else in the family was asleep. Appellant said he wanted to have sex with her. E.G. said no multiple times. Appellant threatened that he would cut her mother's (Yolanda's) throat while her mother was sleeping if E.G. did not agree. She believed his threat because he "had a tendency to be violent" and, if her mother did not make what he wanted for dinner, he would "get angry and throw things." Appellant persisted until E.G. lay down in the garage. Appellant got on her, and he penetrated her vagina with his penis. E.G., who was a virgin, was scared; it hurt and she cried quietly until appellant finished. After this incident, E.G. did not tell anyone because appellant had threatened to hurt her mother.

### B. Appellant's repeated sexual assaults of E.G.

After the first incident in 2009, appellant committed multiple additional sexual assaults of E.G. She testified at trial that the sexual assaults initially occurred about once or twice per week. After about three months the sexual assaults increased in frequency to almost daily. The assaults mostly occurred in the garage when everyone was asleep. At times, appellant would threaten to hurt E.G.'s mother (Yolanda), and he would threaten

3.

to hurt E.G.'s siblings, including her half-sister (appellant's daughter). Appellant would threaten to grab his daughter, throw her in a car, and drive off a cliff.

E.G. testified that, if she protested, appellant would make a new threat about hurting a new person in the family. After a while, appellant stopped threatening her, but he would tell her to follow him or she knew " 'what's gonna [*sic*] happen.' "

At some point, appellant took nude photographs of E.G. using his cellular phone. She did not give him permission to photograph her. He threatened to send the photos to her grandfather and to call her grandfather in a "threatening manner." After making this threat, appellant placed his penis inside her vagina.

### C. Appellant's sexual assault of E.G. between June 1 and December 31, 2010 (count 5).

In 2010, E.G. was 17 years old. At trial, she agreed that appellant sexually assaulted her between June 1 and December 31, 2010. She agreed that, during this time period, appellant threatened her, and he placed his penis inside her vagina more than one time.

### D. Appellant's sexual assault of E.G. between January 1 and April 5, 2011 (count 6).

E.G. turned 18 years old in April of 2011. At trial, she agreed that appellant sexually assaulted her between January 1 and April 5, 2011, when she was 17 years old. She agreed that, during this time period, appellant placed his penis inside her vagina more than one time, but she could not remember how many times that occurred. She agreed that he made the same threats to her during this time period, and she was afraid of him.

E.G. testified that she became pregnant as a result of appellant sexually assaulting her between January 1 and April 5, 2011. She learned that she was pregnant two weeks after her 18th birthday She testified that she had not had sex with anyone else during this time period. After carrying the baby to full term, E.G. gave birth to appellant's daughter in October of 2011. E.G. did not tell her mother that appellant was the father.

4.

At trial, the jury learned that, as a result of deoxyribonucleic acid testing, appellant cannot be excluded as the father of E.G.'s baby. Within the Hispanic population, it is about 3.2 million times more likely that E.G. and appellant are the parents of this baby.[3]

### E. Appellant's final sexual assault of E.G. on February 26, 2013 (count 1).

Appellant's final sexual assault of E.G. occurred on February 26, 2013. That night, appellant was at Yolanda's house visiting his daughters. Appellant and Yolanda were in the process of ending their relationship. Yolanda asked E.G. to give appellant a ride. E.G. agreed and she dropped appellant off in a rural area where he was going to get a ride into Fresno. During the drive, appellant was yelling at E.G. because she did not want him to spend the night. After dropping off appellant, E.G. returned home. A short time later, Yolanda asked her to go back and retrieve appellant because his ride had not materialized. Because Yolanda was busy with the children, E.G. agreed to pick up appellant.

E.G. found appellant near an orchard. It was dark outside. After E.G. stopped the van for him, appellant reached into the van and he took the keys from the ignition. He "yanked" her out of the van. He told her that he was in love with her and he was breaking up with her mother in order to be with her. He told her he wanted to have sex with her, but she said "no."

Appellant got upset and he pushed her into the van. He told her "if you don't just let me, you know what's gonna [*sic*] happen." He also told her that he had planted explosives at the house while he was visiting his children and he was going to "blow everybody up" if E.G. did not do what he said. She was scared. She told the jury that she believed appellant's threats because he was often violent and erratic. She did not want to

---

[3] Following his convictions in this matter, appellant admitted to the probation officer that he is the father of E.G.'s baby. In his reply brief, appellant admits that he conceived a child with E.G.

be with him, but she told the jury that she had learned not to "fight it" when appellant acted like this.

At some point, Yolanda called E.G.'s cellphone, and appellant took the cellphone away from E.G. When appellant took the cellphone away from E.G., Yolanda was on the line. The connection stayed open for a time and Yolanda could hear E.G. crying and yelling at appellant to give back her keys and her cellphone. Yolanda heard E.G. tell appellant, " 'You don't even know what love is' " and Yolanda heard a lot of arguing. Yolanda became alarmed. She sensed that E.G. was in danger and she suspected that appellant "was up to something." Yolanda called law enforcement, which responded to her residence at about 11:22 p.m. that night.

Appellant drove E.G. to a secluded area.[4] She was in the back of the van, and appellant climbed on her. He pulled down her pants. When asked at trial if she was resisting at that point, she said, "It was like to me at the point of no return so I just kinda [sic] let him and laid there." Appellant put his penis inside her vagina. She told the jury that she said "no" multiple times before appellant had sex with her on this occasion.[5]

## II.   E.G. Escapes From Appellant And She Returns Home.

After appellant had intercourse with E.G. in the back of her van, he returned to the driver's seat. He began to drive around. He gave E.G.'s cellphone back to her, and E.G. spoke with her mother. During that call, E.G. spoke with a law enforcement agent, who was with Yolanda. Appellant realized that E.G. was speaking with law enforcement and he took her phone away from her again.

---

[4]     According to E.G.'s statements to law enforcement, appellant drove her to two different locations before the sexual assault occurred.

[5]     At trial, E.G. admitted that she once had consensual sex with appellant. She believed that single incident occurred when she was 18 years old after she had learned that she was pregnant.

Appellant called Yolanda several times that night. He told her to inform law enforcement that she "was crazy" and "making everything up." In a second phone call, he told her that, if she did not get rid of law enforcement, the next time she saw E.G. she (E.G.) "was gonna [*sic*] be in a box."

E.G. also called Yolanda that night. E.G. told her that appellant wanted Yolanda to "get rid" of law enforcement. If that occurred, appellant would bring E.G. home.

At some point, appellant stopped the van and he exited it. E.G. took that opportunity to drive away, leaving appellant behind.[6] E.G. drove home, arriving around 1:30 a.m. on February 27, 2013. She was crying and she appeared distraught. She informed law enforcement shortly after arriving home that appellant had forced her to have sex.[7]

The jury heard some of the statements that E.G. made to law enforcement that night. According to E.G.'s statements, appellant asked her to have sex with him and, when she refused, he told her he would "wreck the van and lock her inside and light it on fire, make it look like it was an accident," but she again refused to have sex with him. Appellant drove the van from an orchard and they went to a new location, where he again pulled off and asked her to have sex with him. When she refused to have sex, he threatened to blow up her house and her grandparents' house. If she did not want to see her daughter dead, she should get in the back seat with him. E.G. reported to law

---

**6** The jury heard conflicting testimony regarding why appellant exited the van. According to E.G., appellant got out to urinate in an orchard, and she drove away leaving him behind. In contrast, E.G. informed a detective shortly after this incident that appellant had stopped the van to talk with Yolanda on his phone, and he spoke with Yolanda while standing outside the van. E.G. had seized that opportunity to drive home.

**7** For the first time, E.G. disclosed to her mother that same morning that appellant was the father of her (E.G.'s) baby. E.G. had previously informed her mother that the father was someone from school.

enforcement that she feared appellant would harm her daughter so she climbed into the back seat with appellant, and he had sex with her.

## III.  E.G.'s Forensic Examination.

In the early morning hours of February 27, 2013, E.G. underwent a sexual assault examination (SART) with a forensic nurse examiner.  Vaginal swabs were taken.  "Thick, moist, white secretions from the vaginal vault" were observed.  Subsequent forensic testing revealed the presence of appellant's semen taken from swabs obtained during the SART exam.

In addition to showing appellant as a major contributor, testing on the vaginal swab taken from E.G. revealed a "single minor allele" from which no interpretation could be done.  It was possible that E.G. was the contributor of that single allele detected in the sperm fraction, but that single allele did not provide enough information to include or exclude any individual.

## IV.  Appellant Is Arrested.

On February 27, 2013, after E.G. finished her SART exam, law enforcement directed E.G. to call appellant.  E.G. spoke with appellant several times that morning and law enforcement recorded some of their conversations, which were played for the jury.  Appellant agreed to meet E.G. in person to talk.

During one recorded conversation, E.G. told appellant that she was afraid to go see him because "last night you forced me and I didn't want to."  E.G. said she did not want "this" to happen again.  Appellant responded that he was not going to force anything and it was "fine" if E.G. did not want to come.  E.G. stated, "You always say that and you end up doing the same thing."  Appellant said that "this occasion is different. (Unintelligible) and if—if the government is telling you to call me for this, that's fine. Just tell me where to meet you and I will turn myself in.  Is that what you want?"

On February 27, 2013, law enforcement located appellant at the area he had agreed to meet E.G. and he was arrested.

## V.    Appellant's Criminal Acts With C.G.

C.G., who was born in August 1998, was 20 years old at trial. She told the jury that appellant was someone who had previously dated her mother. In May 2013, after E.G. had disclosed the sexual assaults that she had endured, C.G. came forward and informed law enforcement that appellant had also sexually assaulted her. C.G. was about 15 years old when she disclosed the abuse.

### A.    Appellant touches C.G.'s breasts for the first time (count 11).

According to C.G., the first incident with appellant occurred when she was in a van and he told her that he had to touch her. Appellant said he had "orders" from people in Mexico that he had to touch her or bad things would happen to her, or her family, or to himself. Appellant told her "they" would "slowly go through" her entire family, and maybe even her grandparents. C.G. told the jury that appellant "always gave me the impression that he was like with some sort of drug dealer."

C.G. testified that she permitted appellant to touch her breasts under her shirt. She believed appellant, and she did not want any bad things to happen to her family. At trial, she believed this first incident occurred sometime between January 1 and December 31, 2009. She never told anyone because she was always being threatened "one way or another."

### B.    Appellant continually abused C.G. over a two-year period.

After the first time, appellant continued to sexually assault C.G. He again touched her breasts, and he eventually wanted her to touch his penis and orally copulate him. C.G. testified that appellant would touch her every time he came over to the residence between 2009 and 2011. Appellant continued to tell her that he had orders, and they had to do more things. He would touch her in multiple places around the house. She testified

at trial that he did things with her "a couple times a week for however many years it went on …." She agreed that all of the sexual acts with appellant occurred "approximately" between January 1, 2009, and December 31, 2011.

### C. Appellant has C.G. touch his penis (counts 7 and 8).

C.G. could not recall the first time that she touched appellant's penis. She recalled, however, that appellant told her other people were always watching and "they" had cameras. Appellant would direct her to touch his penis with her hand and move up and down. The contact was "skin-to-skin" and it happened so many times that she lost track of the number of times it occurred. She agreed at trial that she put her hand on his penis more than two times. She would sometimes touch his penis for about five minutes, but she claimed other times lasted "an hour" and she would become tired and she would suffer "verbal abuse" and she would have to start over again. She testified that when she touched his penis she was afraid of him and she believed he would harm her or her family. She testified that he was "always angry about something."

### D. Appellant has C.G. place her mouth on his penis (counts 12 and 13).

C.G. did not know how many times she put appellant's penis in her mouth, but she agreed at trial that it happened more than two times. She could not remember how old she was the first time she orally copulated him. She agreed at trial that this occurred sometime between 2009 and 2011 before she started high school.[8] He indicated to her that she had to do this or her family would be harmed. She was scared and crying. He was angry and he continued to threaten her until she orally copulated him. She believed that he would harm her or her family if she did not do it.

### E. Appellant places his penis to C.G.'s vagina (counts 9 and 10).

After a while, the incidents progressed until appellant started to have sex with C.G. He told her that the sex had to happen, and she told the jury that she was tired of

---

[8] C.G. started high school in 2012.

10.

fighting him. The first sexual penetration occurred on her mother's bed before her mother came home. Appellant pulled down her pants and penetrated her vagina with his penis. C.G. testified that it hurt, and she was shocked. She pushed him away when he tried to kiss her. C.G. told the jury that she never told anyone because appellant had threatened her that he had cameras and her family "will begin to disappear one by one." She believed his threats. At trial, she agreed that, after this incident, appellant placed his penis inside her vagina more than two times.

### F. C.G. discloses the abuse after E.G. comes forward.

After appellant's final incident with E.G. on February 26, 2013, C.G. initially told a detective that nothing had happened between her and appellant. C.G. informed the jury that, even though appellant had been detained by authorities, she was still scared. He had said previously that he had "connections and he knew people," and she wanted to make certain that her family was going to be okay.

In approximately May 2013, C.G. informed her mother and law enforcement that appellant had been touching her inappropriately.[9]

## VI. The Prior Incident Of Domestic Violence.

The jury heard about a prior incident of domestic violence involving appellant and Yolanda. On November 22, 2011, appellant pushed Yolanda, he tried to choke her, and he struck her with a flashlight on her stomach. Yolanda was pregnant at the time with appellant's child. Appellant also kicked a car seat which held E.G.'s baby. Appellant had become angry after E.G.'s baby would not stop crying while appellant was trying to sleep. Appellant cut an inflatable toy with a knife, and he threatened to do the same thing

---

[9] An expert testified for the prosecution regarding child sexual abuse accommodation syndrome. In part, the expert explained why some children do not disclose sexual abuse "right away."

to E.G.'s baby if Yolanda could not make the baby become quiet.  Yolanda was afraid that appellant would hurt or kill the baby.

E.G. was at school when this incident occurred.  Yolanda contacted E.G., who came home.  When E.G. arrived home, appellant told her that she had "better shut [the baby] up."  E.G. texted her brother for help, and law enforcement was notified.  Law enforcement arrived a short time later, and appellant was arrested.[10]

E.G. informed the jury that she did not disclose the sexual abuse to law enforcement in 2011 when they responded to the domestic violence incident.  She said she was afraid.  She stated that, after appellant kidnapped and raped her in 2013, it was "just time" to disclose what was happening.

## VII.   The Jury's Verdicts And The Sentences Imposed.

The jury rendered the following verdicts, and we summarize the imposed sentences for each count.[11]  In general, appellant received a maximum determinate prison sentence of 11 years, and a consecutive aggregate indeterminate prison sentence of 340 years to life, plus 50 years.

### A.   Count 1.

In count 1, the amended information alleged forcible rape (§ 261, subd. (a)(2)) of E.G. on or about February 26, 2013. The jury found appellant guilty.  It also found true

---

**10**   In a bifurcated proceeding, the trial court found true that appellant had prior convictions in 2011 stemming from this incident.  Appellant's prior convictions occurred in Tulare County Superior Court case number VCF260556.  He was convicted of inflicting corporal injury (§ 273.5, subd. (a)) and making criminal threats (§ 422).  In 2012, appellant was placed on formal probation for five years.  At sentencing in this matter in 2019, the court terminated probation and imposed upper term prison sentences that were to run concurrently with Tulare County Superior Court case number VCF303351.

**11**   The charge in count 3 (kidnapping E.G. on or about February 26, 2013, in violation of section 207, subdivision (a)) was dismissed before the case was given to the jury.

12.

the special allegations of (1) aggravated kidnapping (§ 667.61, subds. (a) & (d)); (2) kidnap (§ 667.61 subds. (a), (b) & (e)); and (3) multiple victims (§ 667.61, subds. (a), (b) & (e)).

The court sentenced appellant to prison for 50 years to life (§§ 667.61, subds. (a) & (d), 1170.12, subd. (c)(1)), plus an additional five years (§ 667, subd. (a)(1)). This sentence was consecutive to count 4.

**B.    Count 2.**

In count 2, the amended information alleged kidnapping to commit rape (§ 209, subd. (b)(1)) of E.G. on or about February 26, 2013. The jury found appellant guilty.

The court sentenced appellant to prison for 14 years to life (§ 1170.12, subd. (c)(1)), plus an additional five years (§ 667, subd. (a)(1)). This sentence was consecutive to count 4, and it was stayed pursuant to section 654.

**C.    Count 4.**

In count 4, the amended information alleged criminal threats (§ 422) on or about February 26, 2013. The jury found appellant guilty.

The court sentenced appellant to prison for an aggravated term of six years, plus an additional five years (§ 667, subd. (a)(1)). This represented the principal determinate sentence.

**D.    Count 5.**

In count 5, the amended information alleged forcible rape of a child victim (E.G.) over 14 years of age (§ 261, subd. (a)(2)) on or about and between June 1, 2010 and December 31, 2010. The jury found appellant guilty. The jury found true the special allegation of multiple victims (§ 667.61, subds. (a), (b) & (e)).

The court sentenced appellant to prison for 30 years to life (§§ 667.61, subds. (a), (b) & (e), 1170.12, subd. (c)(1)), plus an additional five years (§ 667, subd. (a)(1)). This ran consecutive to count 1.

### E. Count 6.

In count 6, the amended information alleged forcible rape of a child victim (E.G.) over 14 years of age (§ 261, subd. (a)(2)) on or about and between January 1, 2011 and April 5, 2011. The jury found appellant guilty. The jury found true the special allegations of (1) great bodily injury[12] (§§ 667.61, subds. (a) & (d), 12022.8) and (2) multiple victims (§ 667.61, subds. (a), (b) & (e)).

The court sentenced appellant to prison for 50 years to life (§§ 667.61, subds. (a) & (d), 1170.12, subd. (c)(1)), plus an additional five years (§ 667, subd. (a)(1)). This ran consecutive to count 5.

### F. Count 7.

In count 7, the amended information alleged a forcible lewd act upon a child (C.G.) (§ 288, subd. (b)(1)) on or about and between January 1, 2009 and December 31, 2011. The jury found appellant guilty. According to the verdict form, this applied to the first time C.G. placed her hand on appellant's penis. The jury found true the special allegation of multiple victims (§ 667.61, subds. (a), (b) & (e)).

The court sentenced appellant to prison for 30 years to life (§§ 667.61, subds. (a), (b) & (e), 1170.12, subd. (c)(1)), plus an additional five years (§ 667, subd. (a)(1)). This ran consecutive to count 6.

### G. Count 8.

In count 8, the amended information alleged a forcible lewd act upon a child (C.G.) (§ 288, subd. (b)(1)) on or about and between January 1, 2009 and December 31, 2011. The jury found appellant guilty. According to the verdict form, this applied to the last time C.G. placed her hand on appellant's penis. The jury found true the special allegation of multiple victims (§ 667.61, subds. (a), (b) & (e)).

---

[12] During closing argument, the prosecutor asserted that the great bodily injury allegation involved E.G.'s pregnancy stemming from appellant's rape.

The court sentenced appellant to prison for 30 years to life (§§ 667.61, subds. (a), (b) & (e), 1170.12, subd. (c)(1)), plus an additional five years (§ 667, subd. (a)(1)). This ran consecutive to count 7.

**H.    Count 9.**

In count 9, the amended information alleged a forcible lewd act upon a child (C.G.) (§ 288, subd. (b)(1)) on or about and between January 1, 2009 and December 31, 2011. The jury found appellant guilty. According to the verdict form, this applied to the first time appellant placed his penis to C.G.'s vagina. The jury found true the special allegation of multiple victims (§ 667.61, subds. (a), (b) & (e)).

The court sentenced appellant to prison for 30 years to life (§§ 667.61, subds. (a), (b) & (e), 1170.12, subd. (c)(1)), plus an additional five years (§ 667, subd. (a)(1)). This ran consecutive to count 8.

**I.    Count 10.**

In count 10, the amended information alleged a forcible lewd act upon a child (C.G.) (§ 288, subd. (b)(1)) on or about and between January 1, 2009 and December 31, 2011. The jury found appellant guilty. According to the verdict form, this applied to the last time appellant placed his penis to C.G.'s vagina. The jury found true the special allegation of multiple victims (§ 667.61, subds. (a), (b) & (e)).

The court sentenced appellant to prison for 30 years to life (§§ 667.61, subds. (a), (b) & (e), 1170.12, subd. (c)(1)), plus an additional five years (§ 667, subd. (a)(1)). This ran consecutive to count 9.

**J.    Count 11.**

In count 11, the amended information alleged a lewd act upon a child (C.G.) (§ 288, subd. (a)) on or about and between January 1, 2009 and December 31, 2011. The jury found appellant guilty. According to the verdict form, this applied to the first time

15.

appellant placed his hand on C.G.'s breast.  The jury found true the special allegation of multiple victims (§ 667.61, subds. (a), (b) & (e)).

The court sentenced appellant to prison for 30 years to life (§§ 667.61, subds. (a), (b) & (e), 1170.12, subd. (c)(1)), plus an additional five years (§ 667, subd. (a)(1)).  This ran consecutive to count 10.

### K.     Count 12.

In count 12, the amended information alleged a lewd act upon a child (C.G.) (§ 288, subd. (a)) on or about and between January 1, 2009 and December 31, 2011.  The jury found appellant guilty.  According to the verdict form, this applied to the first time C.G. placed her mouth to appellant's penis.  The jury found true the special allegation of multiple victims (§ 667.61, subds. (a), (b) & (e)).

The court sentenced appellant to prison for 30 years to life (§§ 667.61, subds. (a), (b) & (e), 1170.12, subd. (c)(1)), plus an additional five years (§ 667, subd. (a)(1)).  This ran consecutive to count 11.

### L.     Count 13.

In count 13, the amended information alleged a lewd act upon a child (C.G.) (§ 288, subd. (a)) on or about and between January 1, 2009 and December 31, 2011.  The jury found appellant guilty.  According to the verdict form, this applied to the last time C.G. placed her mouth to appellant's penis.  The jury found true the special allegation of multiple victims (§ 667.61, subds. (a), (b) & (e)).

The court sentenced appellant to prison for 30 years to life (§§ 667.61, subds. (a), (b) & (e), 1170.12, subd. (c)(1)), plus an additional five years (§ 667, subd. (a)(1)).  This ran consecutive to count 12.

## DISCUSSION

## I.    Sufficient Evidence Supports Appellant's Convictions In Counts 1, 5 and 6.

Appellant contends that his convictions in counts 1, 5 and 6 must be reversed for insufficient evidence. These convictions all involved forcible rapes of E.G. Count 1 was the final incident on February 26, 2013. Count 5 occurred on or about and between June 1, 2010 and December 31, 2010. Count 6 occurred on or about and between January 1, 2011 and April 5, 2011.

### A.    Background.

The trial court instructed the jury with CALCRIM No. 1000 regarding the elements necessary to establish appellant's guilt of forcible rape in violation of section 261, subdivision (a)(2). The jury was told appellant was guilty if: (1) he had sexual intercourse with a woman; (2) he and the woman were not married to each other at the time of intercourse; (3) the woman did not consent to the intercourse; and (4) appellant "accomplished the intercourse by force, violence, duress, menace or fear of immediate and unlawful bodily injury to the woman or to someone else."

The jury was informed that "duress" means "a direct or implied threat of violence, force, danger or retribution that would cause a reasonable person to do or submit to something that she would not do or submit to otherwise. When deciding whether the act was accomplished by duress, consider all the circumstances, including the woman's age and her relationship to [appellant]."

### B.    Standard of review.

When considering a challenge to the sufficiency of the evidence to support a conviction, we review the record in the light most favorable to the judgment and decide whether it contains substantial evidence from which a reasonable finder of fact could make the necessary finding beyond a reasonable doubt. The evidence must be reasonable, credible and of solid value. We presume every inference in support of the

17.

judgment that the finder of fact could reasonably have made. We do not reweigh the evidence or reevaluate witness credibility. We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

### C. Analysis.

Appellant argues that no evidence links any physical force or duress to the charges in counts 1, 5 and 6. Specifically regarding counts 5 and 6, he asserts his due process rights were violated because he was convicted based on "generic testimony" that did not establish any specific incident of rape. He maintains that these three convictions must be reversed, and retrial must be barred.

We reject appellant's various arguments. The jury had sufficient evidence to find appellant guilty in each count of forcible rape involving E.G.

### 1. Count 1.

Count 1 involved the forcible rape of E.G. inside her van on February 26, 2013. Appellant notes that E.G. was 19 years old when this occurred, and she was a college student studying accounting. He maintains she was "reasonably intelligent." He contends that his alleged threat to wreck her van, lock her inside, and light it on fire did not cause her to give consent to have sex with him. He asserts that, although E.G. acquiesced to intercourse with appellant after he threatened to blow up her house, no connection was established between that threat and her acquiescence. He categorizes his threat to blow up the house as "puffery" and he concludes the evidence strongly implied that she did not believe it. He notes that E.G. never asked law enforcement to look for allegedly planted explosives at her house.

We reject appellant's arguments. The evidence overwhelmingly establishes that he used direct and implied threats of violence, force or danger to accomplish the sexual intercourse on February 26, 2013.

To determine the existence of duress, the jury was entitled to consider "the total circumstances" surrounding E.G.'s relationship with appellant. (§ 261, subd. (b); CALCRIM No. 1000.) The jury learned that appellant had threatened E.G. for years. He had repeatedly threatened to harm E.G., her mother, her siblings, and her baby. E.G. testified that she was afraid of appellant. She testified that appellant "had a tendency to be violent" and he would "get angry and throw things." E.G. was aware that appellant had struck her mother in 2011.

E.G. was approximately 19 years old when the rape in February 2013 occurred. Although she was a legal adult, she was still relatively young, and she had been subjected since 2009 to appellant's predatory behavior; he first raped her when she was 16 years old. The total circumstances demonstrate that appellant was in a position of authority and control over her, both physically and emotionally.

On the night in question, appellant took away E.G.'s keys to the van when she was in a rural area. He made it clear that she had to have sex with him. When she refused, he became angry and pushed her into the van. He told her "if you don't just let me, you know what's gonna [*sic*] happen."

Appellant threatened to wreck E.G.'s van and lock her inside and light it on fire, but she again refused to have sex with him. Appellant drove the van to a new location, and he parked in a secluded area. He told her that he had planted explosives at the house while he was visiting his children and he was going to "blow everybody up" if E.G. did not do what he said. She was scared. She told the jury that she believed appellant's threats because he was often violent and erratic. She did not want to be with him, but she told the jury that she had learned not to "fight it" when appellant acted like this.

E.G. was in the back of the van, and appellant climbed on her. He pulled down her pants. When asked at trial if she was resisting at that point, she said, "It was like to me at the point of no return so I just kinda [*sic*] let him and laid there." He put his penis

inside her vagina. She told the jury that she said "no" multiple times before appellant had sex with her on this occasion.

The jury heard some of the statements that E.G. made to law enforcement that night. According to those statements, appellant asked her to have sex with him and, when she refused, he told her he would "wreck the van and lock her inside and light it on fire, make it look like it was an accident," but she again refused to have sex with him. Appellant drove the van from an orchard and they went to a new location, where he again pulled off and asked her to have sex with him. When she refused to have sex, he threatened to blow up her house and if she did not want to see her daughter dead, she should get in the back seat with him. E.G. reported to law enforcement that she feared appellant would harm her daughter so she climbed into the back seat with appellant, and he had sex with her.

We need not fully respond to appellant's arguments that some of his threats on the night in question were not objectively reasonable. Instead, the totality of the evidence overwhelmingly demonstrates that appellant subjected E.G. to express and implied threats of violence, both prior to the night in question and during that specific incident. Although E.G. may have submitted to having sex with appellant on February 26, 2013, it is abundantly apparent that E.G. never consented to the sex act. Her decision was not freely and voluntarily made. (§ 261.6.) The evidence shows that her participation was impelled by appellant's threats. It is apparent that E.G. made a selection between two evils—rape versus the ongoing and relentless violence which appellant threatened. Under these circumstances, E.G. did not exercise free will. (See *People v. Ireland* (2010) 188 Cal.App.4th 328, 336 [noting a rape victim does not consent if she submits to her attacker in light of threats of violence].)

E.G.'s testimony, by itself, represents substantial evidence establishing that appellant committed forcible rape on February 26, 2013. (See *People v. Young* (2005) 34

Cal.4th 1149, 1181 [unless it is physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction.].) Moreover, E.G.'s testimony, at least in part, was corroborated by Yolanda. Appellant took away E.G.'s cellphone at some point during this incident. Through an open line, Yolanda could hear E.G. crying and yelling at appellant to give back her keys and her cellphone. Yolanda heard E.G. tell appellant, " 'You don't even know what love is,' " and Yolanda heard a lot of arguing. Yolanda became alarmed. She sensed that E.G. was in danger and she suspected that appellant "was up to something."

Finally, the jury heard the recorded phone calls between E.G. and appellant shortly after this rape. E.G. told appellant that she was afraid to go see him because "last night you forced me and I didn't want to." E.G. said she did not want "this" to happen again. Appellant responded that he was not going to force anything and it was "fine" if E.G. did not want to come. E.G. stated, "You always say that and you end up doing the same thing." Appellant said that "this occasion is different. (Unintelligible) and if—if the government is telling you to call me for this, that's fine. Just tell me where to meet you and I will turn myself in. Is that what you want?"

With CALCRIM No. 357, the jurors were informed that they could consider whether or not appellant made an adoptive admission. With CALCRIM No. 358, the jurors were instructed that they could consider appellant's pretrial statements. During this phone call, E.G. made it clear that appellant had "forced" her the night before. Appellant's response to her strongly suggested he knew she had not consented to the intercourse.

Although appellant can point to other interpretations that can be drawn from the record, we will not reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*People v. D'Arcy*, *supra*, 48 Cal.4th at p. 293.) Instead, this record overwhelmingly demonstrates that appellant accomplished the intercourse on

21.

February 26, 2013, by force, violence, duress, menace or fear of immediate and unlawful bodily injury to E.G. or to someone else. (§ 261, subd. (a)(2); CALCRIM No. 1000.) Appellant's arguments to the contrary are without merit.

### 2. Counts 5 and 6.

Count 5 alleged a forcible rape of E.G. as a minor, which was alleged to have occurred on or about and between June 1, 2010 and December 31, 2010. Count 6 involved a forcible rape of E.G. as a minor, which was alleged to have occurred on or about and between January 1, 2011 and April 5, 2011.

Appellant argues that his purported threat to send a nude photo of E.G. to her grandfather does not establish force or duress. He contends it was unreasonable for E.G. to believe such a threat could kill her grandfather. Appellant further asserts that an inference can be drawn from the record that E.G. was in a consensual relationship with him, and they were both invested in keeping this secret from her mother, Yolanda. He notes that E.G. lied to her mother about the paternity of her child, and E.G. admitted having consensual intercourse with appellant on at least one occasion. He maintains that E.G. showed no reluctance to report his behavior to law enforcement in 2011 when he assaulted Yolanda.

Appellant notes that E.G. never testified about a specific act of intercourse in either 2010 or 2011. He argues that only "generic testimony" was used to establish his guilt in counts 5 and 6. He asserts such testimony should not be deemed sufficient to prove a forcible rape under section 261. He claims his due process rights were violated. He contends his defense at trial was that his sexual acts with E.G. were consensual and not forced. He asserts that, because the jury received generic testimony for the allegations in 2010 and 2011, it could not evaluate properly whether the acts were forcible or consensual. He asks this court to reverse his convictions in counts 5 and 6.

22.

We reject appellant's various arguments. We find two opinions instructive: (1) *People v. Jones* (1990) 51 Cal.3d 294 (*Jones*) and (2) *People v. Matute* (2002) 103 Cal.App.4th 1437 (*Matute*).

### a. *Jones*.

In *Jones*, the six counts at issue each charged one event in a different two-month period. (*Jones*, *supra*, 51 Cal.3d at p. 303.) The victim of these counts testified that the abuse occurred once or twice a month during the charged periods. (*Jones*, at p. 302.) The California Supreme Court held that the victim's generic testimony constituted substantial evidence supporting these six convictions. "[I]n determining the sufficiency of generic testimony, we must focus on factors other than the youth of the victim/witness. Does the victim's failure to specify precise date, time, place or circumstance render generic testimony insufficient? Clearly not. As many of the cases make clear, the particular details surrounding a child molestation charge are not elements of the offense and are unnecessary to sustain a conviction. [Citations.] [¶] The victim, of course, must describe *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy). Moreover, the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping'). Finally, the victim must be able to describe *the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure the acts were committed within the applicable limitation period. Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction." (*Jones*, at pp. 315–316.)

23.

The *Jones* court also addressed whether the victim's generic testimony violated the defendant's due process rights. (*Jones*, *supra*, 51 Cal.3d at p. 316.) First, it held that reliance on generic evidence did not violate a defendant's due process right to notice. "We conclude that, given the availability of the preliminary hearing, demurrer and pretrial discovery procedures, the prosecution of child molestation charges based on generic testimony does not, of itself, result in a denial of a defendant's due process right to fair notice of the charges against him." (*Id.* at p. 318.) Second, the court concluded that reliance on generic testimony did not deprive a defendant of his or her due process right to present a defense. (*Id.* at pp. 319–320.) Finally, the court held that a defendant's right to a unanimous verdict was ensured by unanimity instructions. (*Id.* at p. 321.)

### b. *Matute*.

In *Matute*, the defendant was convicted of 15 counts of forcible rape involving his daughter. (*Matute*, *supra*, 103 Cal.App.4th at p. 1439.) The appellate court rejected the defendant's arguments that his due process rights were violated because his teenaged daughter failed to give specific details regarding the time and circumstances of each count for which he was charged. (*Ibid.*) The crimes committed against the daughter occurred when she was 15 and 16 years old. (*Id.* at p. 1447.) Thus, the *Matute* court concluded that *Jones* was factually distinguishable because *Jones* involved molestation of children under the age of 14. (*Matute*, *supra*, at p. 1447.) Nevertheless, the reasoning and conclusion from *Jones* were applicable because the defendant's daughter had lived with him from birth, and was molested by him "from the time she was six years old; he continuously forced sexual intercourse on her from the time she was 12 until she was 16, until he was arrested." (*Matute*, at p. 1447.) The *Matute* court concluded that the fact the daughter was 15 and 16 when she was raped "makes little difference with regard to her inability to differentiate among the continual rapes perpetrated by defendant." (*Ibid.*)

24.

In the present matter, appellant asserts that *Jones* and *Matute* are distinguishable. He notes that the charges under section 288 in *Jones* did not involve a question of consent. He argues that E.G. was 17 years old when the first charged forcible rape occurred in 2010.[13] He contends that E.G. was not very young, and she was able to provide specific testimony about her first intercourse with appellant in 2009. He asserts she had the memory and verbal skills needed to give specific testimony. Appellant maintains that, unlike in *Jones* and *Matute*, E.G. was not victimized for "many years, or from a very young age." Instead, the offenses occurred in a "relatively brief period of time just prior to her legal adulthood."

We disagree with appellant's arguments and we reject his due process challenge. *Jones* and *Matute* are instructive, and we will follow their reasoning. In *Jones*, our Supreme Court acknowledged that "even a mature victim might understandably be hard pressed to separate particular incidents of repetitive molestations by time, place or circumstance." (*Jones, supra*, 51 Cal.3d at p. 305.)

The jurors in this matter were given a unanimity instruction with CALCRIM No. 3500. They were told appellant was charged with forcible rape, forcible lewd acts upon a child and lewd acts upon a child in counts 5 through 13. The jurors were informed that the prosecution had presented evidence of more than one act to prove that appellant had committed these offenses. They were told they could not find appellant guilty unless they all agreed that the People had proven that appellant committed at least one of these acts, and they all agreed on which act he committed.

---

[13]    E.G. testified that the first sexual intercourse with appellant occurred in 2009 when she was 16 years old. Appellant threatened to cut her mother's throat if she did not consent. The prosecution did not charge that act as a crime. Appellant notes that the earliest charged forcible rape involving E.G. was alleged between June 1, 2010 and December 31, 2010.

With CALCRIM No. 3501, the jurors were instructed on unanimity when generic testimony had been presented. They were told that appellant had been charged with forcible rape, forcible lewd acts upon a child, and lewd acts upon a child sometime between January 1, 2009, and December 31, 2011. The jurors were informed that the prosecution had presented evidence of more than one act to prove that appellant had committed these offenses. They were instructed that they could not find appellant guilty unless they all agreed that the prosecution had proven he had committed at least one of these acts, and they all agreed on which act he committed for each offense. In the alternative, the jurors were told they could all agree that the prosecution had proven appellant had committed all the acts alleged to have occurred during the time period and had proven that appellant committed at least the number of offenses charged.

With CALCRIM No. 3515, the jurors were instructed that each count charged in this case was a separate crime. The jurors were directed to consider each count separately and return a separate verdict for each one.

E.G.'s trial testimony established that appellant repeatedly forced her to have intercourse with him from 2009 through 2011. He repeatedly threatened her with physical violence, or violence to others, if she did not comply.

Specific to the charge in count 5, E.G. agreed at trial that appellant sexually assaulted her between June 1 and December 31, 2010. She agreed that, during this time period, appellant threatened her, and he placed his penis inside her vagina more than one time. Specific to the charge in count 6, she agreed at trial that appellant sexually assaulted her between January 1 and April 5, 2011, when she was 17 years old. She agreed that, during this time period, appellant placed his penis inside her vagina more than one time, but she could not remember how many times that occurred. She agreed that he made the same threats to her during this time period, and she was afraid of him.

E.G. testified that she became pregnant as a result of appellant sexually assaulting her between January 1 and April 5, 2011. E.G. testified that she did not have sex with anyone else during this time period. She learned that she was pregnant two weeks after her 18th birthday. After carrying the baby to full term, E.G. gave birth to appellant's daughter in October 2011.

Although E.G. provided generic testimony to support the charges in counts 5 and 6, she stated that appellant placed his penis inside her vagina and he threatened her during the time periods alleged. Thus, she described separate criminal acts committed during different time periods. Her testimony represents sufficient evidence to support separate criminal sanctions. (*Jones*, *supra*, 51 Cal.3d at p. 314.) Moreover, because she described different criminal acts occurring in different time periods, E.G.'s testimony satisfies due process. (See *Jones*, *supra*, at pp. 316, 318; *Matute*, *supra*, 103 Cal.App.4th at p. 1447.)

Finally, we find appellant's argument unpersuasive that a reasonable inference can be drawn from this record that E.G. had a consensual sexual relationship with him, which she hoped to hide from her mother. Contrary to appellant's claim, the record overwhelmingly infers that E.G. did not have a consensual relationship with appellant, even though she admitted to one consensual act of intercourse. In any event, although appellant can point to other interpretations from the record, we will not reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*People v. D'Arcy*, *supra*, 48 Cal.4th at p. 293.)

Based on this record, a reasonable jury could have found appellant guilty of forcible rape (§ 261, subd. (a)(2)) beyond a reasonable doubt in counts 1, 5 and 6. This evidence was reasonable, credible and of solid value. Thus, substantial evidence supports these convictions. (See *People v. D'Arcy*, *supra*, 48 Cal.4th at p. 293.) Accordingly, appellant's arguments are without merit, and reversal of these counts is not warranted.

**II.**     **Sufficient Evidence Supports Appellant's Convictions In Counts 7, 8, 9 and 10.**

Appellant asserts that his convictions in counts 7, 8, 9 and 10 must be reversed for insufficient evidence. These convictions all involved forcible lewd acts with C.G., specifically the first and last times C.G. touched appellant's penis with her hand, and the first and last times appellant placed his penis to her vagina.

**A.     Background.**

The trial court instructed the jury with CALCRIM No. 1111 regarding the elements necessary for the prosecution to establish appellant's guilt of forcible lewd or lascivious acts in violation of section 288, subdivision (b)(1). In relevant part, the jury was told appellant was guilty if: (1) he willfully touched any part of a child's body either on the bare skin or through clothing, or he willfully caused a child to touch her own body, the defendant's body or the body of someone else, either on bare skin or through clothing; (2) in committing the act, he "used force, violence, duress, menace or fear of immediate and unlawful bodily injury to the child or to someone else"; (3) he committed the act with the intent of arousing, appealing to or gratifying the lusts, passions or sexual desires of himself or the child; and (4) the child was under the age of 14 years at the time of the act.

The jury was informed that the force used "must be substantially different from or substantially greater than the force needed to accomplish the act itself." The jury was also told that "duress" means "the use of a direct or implied threat of force, violence, danger, hardship or retribution sufficient to cause a reasonable person to do or submit to something that he or she would not otherwise do or submit to. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the child and her relationship to [appellant]."

28.

**B.      Standard of review.**

We have already set forth the applicable standard of review.  We will review the record in the light most favorable to the judgment and decide whether it contains substantial evidence from which a reasonable finder of fact could make the necessary finding beyond a reasonable doubt.  The evidence must be reasonable, credible and of solid value.  (*People v. D'Arcy*, *supra*, 48 Cal.4th at p. 293.)

**C.      Analysis.**

Under section 288, subdivision (b)(1), any person who commits a lewd or lascivious act upon a child under 14 years "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person, is guilty of a felony …."  (§ 288, subd. (b)(1).)

Appellant asserts that no causal link exists between his "supposed implied threats" to C.G. and the acts charged in counts 7 through 10.  Regarding the allegations in counts 7 and 8 (hand to penis), appellant contends that C.G. described no physical force used by him to accomplish these crimes, and nothing shows a "pattern" of physical force.  Regarding the allegations in counts 9 and 10 (penis to vagina), appellant maintains that, although C.G. testified that appellant inserted himself "very roughly" the first time and it hurt, that testimony did not demonstrate physical force substantially different or greater than the force necessary to accomplish the lewd act itself.  He further notes that C.G. testified that he put his penis inside her vagina more than twice, but she gave no specifics about those other occasions.  Appellant concludes that his convictions in counts 7, 8, 9 and 10 must be reversed for insufficient evidence.

We reject appellant's arguments.  The jury had sufficient evidence to find him guilty beyond a reasonable doubt in counts 7 through 10.  We find instructive *People v. Veale* (2008) 160 Cal.App.4th 40 (*Veale*).

In *Veale*, the defendant was convicted of three counts of committing a lewd act upon a child under the age of 14 by force, fear, or duress.  (*Veale*, *supra*, 160 Cal.App.4th

29.

at p. 42.) The defendant had married the victim's mother, and he lived with the victim. (*Id.* at p. 43.) He began molesting her when she was six or seven years old. (*Ibid.*)

On appeal, the defendant contended the evidence was insufficient to support his convictions, arguing there was no evidence he had used force or duress. (*Veale*, *supra*, 160 Cal.App.4th at p. 45.) The *Veale* court rejected that argument. (*Id.* at p. 47.) A reasonable inference could be made that the defendant made an implied threat which was sufficient to support a finding of duress. (*Ibid.*) The victim feared the defendant and was afraid that if she told anyone about the molestation, the defendant would harm or kill her, her mother or someone else. (*Ibid.*) In addition, a finding of duress was also supported by the victim's young age when she was molested, the disparity between her age and size compared to the defendant, and the defendant's position of authority in the family. (*Ibid.*)

In the present matter, the evidence establishes that appellant committed the forcible lewd and lascivious acts through the use of duress. Appellant began to touch C.G. in 2009 when she was about 11 years old. The first incident with appellant occurred when she was in a van and he told her that he had to touch her. Appellant said he had "orders" from people in Mexico that he had to touch her or bad things would happen to her, or her family, or to himself. C.G. testified that she permitted appellant to touch her breasts under her shirt. She believed appellant, and she did not want any bad things to happen to her family. At trial, she testified that she never told anyone because she was always being threatened "one way or another."

C.G. testified that, after this first incident, appellant continued to sexually assault her. He again touched her breasts, and he eventually wanted her to touch his penis and orally copulate him. C.G. testified that appellant would touch her every time he came over to the residence between 2009 and 2011. Appellant continued to tell her that he had orders, and they had to do more things. She could not recall the first time that she

30.

touched appellant's penis. She recalled, however, that appellant told her other people were always watching and "they" had cameras. Appellant would direct her to touch his penis with her hand and move up and down. The contact was "skin-to-skin" and it happened so many times that she lost track of the number of times it occurred. She agreed at trial that she put her hand on his penis more than two times. She testified that when she touched his penis she was afraid of him and she believed he would harm her or her family. She testified that he was "always angry about something."

C.G. did not know how many times she put appellant's penis in her mouth, but she agreed at trial that it happened more than two times. She could not remember how old she was the first time she orally copulated appellant. She agreed at trial that this occurred sometime between 2009 and 2011 before she started high school.[14] He indicated to her that she had to do this or her family would be harmed. She was scared and crying. He was angry and he continued to threaten her until she orally copulated him. She believed that he would harm her or her family if she did not do it.

C.G. told the jury that, after a while, appellant told her that she had to have sex with him. She told the jury that she was tired of fighting him. The first sexual penetration occurred on her mother's bed before her mother came home. Appellant pulled down her pants and penetrated her vagina with his penis. C.G. testified that it hurt, and she was shocked. C.G. told the jury that she never told anyone because appellant had threatened her that he had cameras and her family "will begin to disappear one by one." She believed his threats. At trial, she agreed that, after this incident, appellant placed his penis inside her vagina more than two times.

After appellant's final incident with E.G. on February 26, 2013, C.G. initially told a detective that nothing had happened between her and appellant. C.G. informed the jury that, even though appellant had been detained by authorities, she was still scared. He had

---

[14] C.G. started high school in 2012.

31.

said previously that he had "connections and he knew people," and she wanted to make certain that her family was going to be okay.

Similar to *Veale*, a reasonable inference can be drawn from this record that appellant made implied threats, which compelled C.G. to participate in the forcible lewd acts charged in counts 7 through 10. It is clear that C.G. feared appellant. She repeatedly stated that she was worried he might harm her or her family. Although C.G. was not as young as the victim in *Veale*, appellant was considerably older than she.[15] He held a position of authority in the house because he was in a relationship with C.G.'s mother. For a time, appellant lived in the house with C.G.

The totality of the evidence is more than sufficient to support a finding that appellant committed forcible lewd and lascivious acts with C.G. by means of duress. (See *Veale*, *supra*, 160 Cal.App.4th at p. 47.) A reasonable jury could have found appellant guilty of forcible lewd acts upon a child (§ 288, subd. (b)(1)) beyond a reasonable doubt in count 7 (hand to penis, first time), count 8 (hand to penis, last time), count 9 (penis to vagina, first time), and count 10 (penis to vagina, last time). The evidence supporting these convictions was reasonable, credible and of solid value. Consequently, substantial evidence supports these convictions and reversal is not required. (See *People v. D'Arcy*, *supra*, 48 Cal.4th at p. 293.)

## III.   Instructional Error Did Not Occur And Any Presumed Error Is Harmless.

Appellant argues that certain jury instructions were erroneous in this matter. He contends he was deprived of his constitutional rights to notice and to conviction only on proof beyond a reasonable doubt by a unanimous jury. He asserts that his convictions in counts 5 through 10 must be reversed.

---

[15]   Appellant was born in 1979.

## A.    The applicable jury instructions.

Appellant's claim focuses on the jury instructions provided under CALCRIM Nos. 207, 3500 and 3501.  We summarize these instructions.

### 1.    CALCRIM No. 207.

With CALCRIM No. 207, the jury was instructed that the alleged crimes "occurred on or about the date of February 26th of 2013 and between January 1st of 2009 and December 31st of 2011.  The People are not required to prove the crime took place exactly on the date but only that it happened reasonably close to that date or that time period."

This instruction did not delineate or otherwise separate the applicable time periods for the various counts involving the two victims.

### 2.    CALCRIM No. 3500.

With CALCRIM No. 3500, the jurors were told appellant was charged "with forcible rape, forcible lewd act upon a child and lewd act upon a child in [c]ounts 5 through 13.  [¶]  The People have presented evidence of more than one act to prove that [appellant] committed this offense.  You must not find [appellant] guilty unless you all agree that the People have proved that [appellant] committed at least one of these acts, and you all agree on which act he committed."

### 3.    CALCRIM No. 3501.

With CALCRIM No. 3501, the jurors were instructed that appellant was charged "with forcible rape, forcible lewd act upon a child and lewd act upon a child sometime during the period of January 1st of 2009 to December 31st of 2011.  [¶]  The People have presented evidence of more than one act to prove that [appellant] committed these offenses.  You must not find [appellant] guilty unless:  [¶]  You all agree that [appellant] have—excuse me, unless you all agree that the People have proved that [appellant] committed at least one of these acts and you all agree on which act he committed for each

33.

offense;  [¶]  Or you all agree that the People have proved that [appellant] committed all the acts alleged to have occurred during this time period and have proved that [appellant] committed at least a number—the number of offenses charged."

## B.     Standard of review.

Instructional errors are questions of law, which we review de novo.  (*People v. Guiuan* (1998) 18 Cal.4th 558, 569–570; *People v. Jandres* (2014) 226 Cal.App.4th 340, 358.)  We must ascertain the relevant law and determine whether the given instruction correctly stated it.  (*People v. Kelly* (1992) 1 Cal.4th 495, 525–526.)

## C.     Analysis.

Appellant contends that his due process rights were violated.  He breaks this claim into two parts.  First, he focuses on the instructions given for counts 5 and 6[16] regarding two of the forcible rape claims involving E.G.  Second, he focuses on his convictions in counts 7 through 10 involving forcible lewd acts with C.G.  We analyze—and reject—both of appellant's arguments.  Before doing so, however, we address the parties' dispute regarding forfeiture.

### 1.     We decline to find forfeiture.

The parties dispute whether or not appellant has forfeited this claim.  Respondent contends that appellant forfeited his arguments regarding CALCRIM Nos. 3500 and 3501 because the defense never objected below to the language of these instructions.  In his reply, appellant raises the doctrine of futility.  He notes he objected to the "overly broad" date range provided to the jury with CALCRIM No. 207, and the trial court overruled that objection.  Appellant argues that CALCRIM No. 3501 contains the same "overly broad range of dates."  As such, appellant maintains that any additional objection would

---

**16**     Count 5 alleged a forcible rape of E.G. as a minor, which was alleged to have occurred on or about and between June 1, 2010 and December 31, 2010.  Count 6 involved a forcible rape of E.G. as a minor, which was alleged to have occurred on or about and between January 1, 2011 and April 5, 2011.

have been futile.  He further asserts his claim of instructional error should be reviewed because it impacts his substantial rights.

We need not fully respond to the parties' disputed points regarding forfeiture. Instead, because this alleged error may impact appellant's substantial rights, we will review this claim.  (See § 1259 [appellate court may review any given instruction even without an objection if the defendant's substantial rights are impacted].)  We conclude, however, that this claim fails on its merits; instructional error did not occur and any presumed error is harmless.

### 2.     We reject appellant's arguments regarding counts 5 and 6.

Appellant asserts that the verdict forms for counts 5 and 6 did not specify the relevant time periods.  He argues it is "reasonably probable and highly likely" the jury convicted him in counts 5 and 6 based on the uncharged 2009 incident with E.G. in the garage (their first sexual encounter).  He contends that the testimony about their first sexual encounter in 2009 was very specific while the testimony about the 2010 and 2011 events was vague.

Appellant asserts error occurred with CALCRIM Nos. 207 and 3501.  He contends these instructions permitted the jury to convict him in counts 5 and 6 based on a range of dates far broader than the time periods alleged in counts 5 and 6.  He further argues the jury was erroneously permitted to rely on generic testimony that did not establish proof beyond a reasonable doubt in counts 5 and 6.  Because E.G. admitted at trial that she had consensual intercourse with appellant on one occasion, he argues the People were obligated to prove that she did not consent to the specific charged acts of sexual intercourse.

Finally, appellant maintains that giving CALCRIM No. 3501 was prejudicial. According to appellant, he relied on "consent" at trial, there was evidence of consent on

35.

at least one occasion, and the instructions allowed the jury to find him guilty based on acts outside the charged date ranges. We reject appellant's various arguments.[17]

A defendant challenging a jury instruction as legally inaccurate "must demonstrate a reasonable likelihood that the jury understood the instruction in the way [the defendant has] asserted." (*People v. Covarrubias* (2016) 1 Cal.5th 838, 905.) " '[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.' [Citation.] In reviewing an ambiguous instruction, we inquire whether there is a reasonable likelihood that the jury misunderstood or misapplied the instruction in a manner that violates the Constitution. [Citation.] 'A single instruction is not viewed in isolation, and the ultimate decision on whether a specific jury instruction is correct and adequate is determined by consideration of the entire instructions given to the jury.' " (*Id.* at p. 906.) In considering such a challenge, we presume the jurors are intelligent and capable of understanding and applying the court's instructions. (*Id.* at p. 905.)

In this matter, the jury was instructed with CALCRIM No. 207 that the alleged crimes "occurred on or about the date of February 26th of 2013 and between January 1st of 2009 and December 31st of 2011. The People are not required to prove the crime took place exactly on the date but only that it happened reasonably close to that date or that time period."[18]

---

[17]    In raising this claim, appellant argues that, following the preliminary hearing in this matter, he was held to answer only for offenses occurring in 2010 and 2011. We reject that general assertion. The operative complaint prior to the preliminary hearing was filed in 2014. It charged appellant with crimes against C.G. occurring, in part, in 2009. Following the preliminary hearing, the magistrate held appellant to answer as charged.

[18]    "CALCRIM No. 207 accurately states the general rule that when a crime is alleged to have occurred 'on or about' a certain date, it is not necessary for the prosecution to prove the offense was committed on that precise date, but only that it happened

36.

With CALCRIM No. 3501, the jurors were instructed that appellant was charged "with forcible rape, forcible lewd act upon a child and lewd act upon a child sometime during the period of January 1st of 2009 to December 31st of 2011. [¶] The People have presented evidence of more than one act to prove that [appellant] committed these offenses. You must not find [appellant] guilty unless: [¶] You all agree that [appellant] have—excuse me, unless you all agree that the People have proved that [appellant] committed at least one of these acts and you all agree on which act he committed for each offense; [¶] Or you all agree that the People have proved that [appellant] committed all the acts alleged to have occurred during this time period and have proved that [appellant] committed at least a number—the number of offenses charged."

Although the jury instructions given in this matter under CALCRIM Nos. 207 and 3501 could have been more precise by specifying the specific timelines applicable to each victim and count, the prosecutor made it clear during closing argument that counts 5 and 6 related to specific timelines. According to the prosecutor, count 5 related to the period from June 1 to December 31, 2010, when E.G. was 17 years old. Count 6 related to the period from January 1, to April 5, 2011, also when E.G. was 17 years old. The prosecutor emphasized that count 6 applied to the time period when E.G.'s baby was conceived.

Specific to the charge in count 5, E.G. agreed at trial that appellant sexually assaulted her between June 1 and December 31, 2010. She agreed that, during this time period, appellant threatened her, and he placed his penis inside her vagina more than one time. Specific to the charge in count 6, she agreed at trial that appellant sexually assaulted her between January 1 and April 5, 2011, when she was 17 years old. She agreed that, during this time period, appellant placed his penis inside her vagina more

_____

reasonably close to that date. [Citations.]" (*People v. Rojas* (2015) 237 Cal.App.4th 1298, 1304.)

37.

than one time, but she could not remember how many times that occurred. She agreed that he made the same threats to her during this time period, and she was afraid of him.

E.G. testified that she became pregnant as a result of appellant sexually assaulting her between January 1 and April 5, 2011. E.G. testified that she did not have sex with anyone else during this time period. She learned that she was pregnant two weeks after her 18th birthday. After carrying the baby to full term, E.G. gave birth to appellant's daughter in October 2011.

Based on the trial record and the arguments from the prosecutor, it is not reasonably likely the jury understood the disputed instructions as appellant suggests. It does not appear reasonably likely that the jurors understood they could convict him in counts 5 and/or 6 based on the uncharged rape of E.G. that occurred in 2009. As such, appellant does not demonstrate instructional error. (See *People v. Houston* (2012) 54 Cal.4th 1186, 1229 [it is permissible to review the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner].)

In any event, we also conclude that, even if instructional error occurred, any presumed error was harmless under any conceivable standard. The prosecutor made it clear that appellant's guilt in counts 5 and 6 was based on appellant's conduct in 2010 and 2011. The prosecutor neither suggested nor stated that the jury should find appellant guilty in these counts based on the uncharged rape of E.G. that occurred in 2009.

Furthermore, the evidence before the jury was overwhelming regarding appellant's guilt. As such, any alleged instructional error was harmless beyond any reasonable doubt. (See *Neder v. United States* (1999) 527 U.S. 1, 17–18 [noting overwhelming evidence of guilt rendered alleged instructional error harmless beyond a reasonable doubt]; *People v. Covarrubias* (2015) 236 Cal.App.4th 942, 954 [same].) Therefore,

38.

prejudice is not present even under the more stringent federal standard of review.  (See *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

Based on this record, instructional error did not occur in counts 5 and 6, and any presumed error was harmless.  Accordingly, reversal is not warranted for these counts.

### 3. We reject appellant's arguments regarding counts 7, 8, 9, and 10.

According to appellant, CALCRIM Nos. 3500 and 3501 permitted the jury to "amalgamate the evidence" between the forcible and non-forcible offenses regarding C.G. charged under section 288.  Appellant notes that some evidence of force exists in this record for some counts.  For example, C.G. indicated that appellant would "shake" her in order for her to orally copulate him.  In counts 12 and 13, appellant was convicted of having C.G. place her mouth on his penis.  These counts, however, involved non-forcible lewd acts upon a child in violation of section 288, subdivision (a).  Appellant argues that, based on the instructions given with CALCRIM Nos. 3500 and 3501, the jury could convict him "by simply counting the number of acts they believed, without regard for whether they constituted the specific acts for which appellant had been charged and held to answer."

Appellant's arguments are unpersuasive.  With CALCRIM No. 1111, the trial court instructed the jury that appellant was guilty of violating section 288, subdivision (b)(1), in counts 7 through 10 if the prosecution, in relevant part, proved beyond a reasonable doubt that appellant used force, violence, duress, menace or fear of immediate and unlawful bodily injury to the child or someone else when the lewd acts occurred.

In contrast, the jury was instructed with CALCRIM No. 1110 that appellant was guilty of violating section 288, subdivision (a), in counts 11, 12 and 13, and as lesser included offense to counts 7 through 10, if he committed a lewd or lascivious act on a child under the age of 14 years.  The use of force or duress (or similar conduct) was not required for a conviction under section 288, subdivision (a).

With CALCRIM No. 3515, the court informed the jurors that each charged count was a separate crime. They were told to consider each count separately and return a separate verdict for each one.

During closing argument, the prosecutor said that counts 7 and 8 involved C.G. touching appellant's penis the first and last times. Counts 9 and 10 involved appellant putting his penis to her vagina the first and last times. The prosecutor made it clear that these counts required proof of force. In contrast, the prosecutor stated to the jurors that the charges in counts 11, 12 and 13 did not require any proof of force. These charges involved appellant's hand to C.G.'s breast (count 11), and her oral copulation of him the first time (count 12) and her oral copulation of him the last time (count 13).

Both the court and the prosecutor made it clear that force was a required element for conviction in counts 7 through 10 under section 288, subdivision (b)(1). Thus, it is not reasonably likely the jury understood the disputed instructions as appellant suggests. As a result, instructional error is not present. (See *People v. Houston*, *supra*, 54 Cal.4th at p. 1229.)

Finally, the evidence before the jury was overwhelming regarding appellant's guilt. As such, any alleged instructional error was harmless beyond any reasonable doubt. (See *Neder v. United States*, *supra*, 527 U.S. at pp. 17–18; *People v. Covarrubias*, *supra*, 236 Cal.App.4th at p. 954.) Therefore, prejudice is not present even under the more stringent federal standard of review. (See *Chapman*, *supra*, 386 U.S. at p. 24.)

Based on this record, instructional error did not occur in counts 7, 8, 9 and 10. Further, any presumed error was harmless. Accordingly, reversal is not warranted for these counts, and this claim is without merit.

**IV. The Trial Court Did Not Err In Failing To Give A Unanimity Instruction For Count 4 (Making Criminal Threats) And Any Presumed Error Is Harmless.**

It is undisputed that the trial court failed to provide the jury with a unanimity instruction for count 4 (making criminal threats). Appellant asserts that this was error, and he contends his conviction in count 4 must be reversed.

**A. Background.**

We summarize the relevant pleading and the prosecutor's arguments to the jury.

**1. The allegation for count 4.**

The amended information alleged in count 4 that, on or about February 26, 2013, appellant made criminal threats in violation of section 422. It was alleged that appellant willfully and unlawfully threatened to commit a crime which would result in death and great bodily injury to E.G., with the specific intent that the statement be taken as a threat.

**2. The prosecutor's comments to the jury.**

During opening statements to the jury, the prosecutor asserted that count 4 involved the "numerous threats" that appellant made to E.G. "when she was in the van when he was threatening her and what he would do to her family if she didn't have sex with him."

During closing arguments, the prosecutor informed the jurors that count 4 charged appellant with criminal threats occurring on February 26, 2013. Later, the prosecutor clarified that count 4 applied to threats that appellant made to E.G. The prosecutor argued that appellant threatened to hurt her family. "I believe she testified that he threatened to kill her daughter." The prosecutor invited the jurors to ask the court reporter to read them the testimony if there was any disagreement on what was said.

The prosecutor also asserted that appellant had "threatened to crash the van and set it on fire" with E.G. inside. "He threatened to kill her daughter, and he also threatened to kill her family." The prosecutor argued that E.G. believed appellant was capable of harming her, she was in sustained fear for her own safety, and for the safety of her

41.

immediate family. The prosecutor noted that E.G. testified that she felt "she was sacrificing herself because she believed that the threats that he made against her family would be carried out." The prosecutor concluded that E.G.'s fear was reasonable under the circumstances.

**B.      Analysis.**

Appellant argues that the following four distinct threats might theoretically serve as the basis for the conviction in count 4:

1.      E.G. testified at trial that, on February 26, 2013, appellant said he had planted explosives at the house while he was visiting his children and he was going to "blow everybody up" if E.G. did not do what he said.

2.      Yolanda testified at trial that, on February 26, 2013, she received a telephone call from appellant. According to Yolanda, appellant told her that if she did not get rid of the police, the next time Yolanda saw her daughter, she would "be in a box."

3.      According to E.G.'s statements to law enforcement, appellant asked her to have sex with him and, when she refused, he told her he would "wreck the van and lock her inside and light it on fire, make it look like it was an accident," but she again refused to have sex with him.

4.      According to E.G.'s statements to law enforcement, when she refused to have sex, appellant threatened to blow up her house and, if she did not want to see her daughter dead, she should get in the back seat with him.

Appellant contends his due process rights were infringed because the trial court had a sua sponte obligation to provide a unanimity instruction for count 4. He asserts that he was prejudiced, and his conviction in count 4 must be reversed. We disagree. A

unanimity instruction was not required in count 4 and any presumed error was harmless.[19]

### 1.    A unanimity instruction was not required.

The Sixth Amendment of the United States Constitution provides that those accused of a crime have the right to a trial by an impartial jury. (*People v. McDaniel* (2021) 12 Cal.5th 97, 160.) This right, in conjunction with the due process clause, requires that each element of a crime be proved to a jury beyond a reasonable doubt. (*Ibid.*) In addition, a jury's verdict must be unanimous to convict a defendant of a serious offense. (*Ibid.*, citing *Ramos v. Louisiana* (2020) 590 U.S. ___ [140 S.Ct. 1390, 1397].)[20]

Because unanimous jury verdicts are required in criminal cases, when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) A unanimity instruction is required if the jurors could convict a defendant of the crime charged but otherwise disagree which act the defendant committed. (*People v. Maury* (2003) 30 Cal.4th 342, 423.)

However, a trial court has no sua sponte duty to instruct on unanimity if the offense constitutes a "continuous course of conduct." (*People v. Maury*, *supra*, 30 Cal.4th at p. 423.) This exception occurs in two situations: (1) when the acts are so closely connected that they form part of one and the same transaction, and, thus, constitute one offense; or (2) when the statute contemplates a continuous course of

---

[19]    The parties dispute whether or not appellant has forfeited this claim. We decline to find forfeiture because appellant's claim asserts that the trial court had a sua sponte duty to provide the unanimity instruction.

[20]    While appellant's appeal was pending before this court, the United States Supreme Court rendered its decision in *Ramos v. Louisiana*. In April 2020, appellant filed a notice in this court of this new authority.

conduct of a series of acts over a period of time. (*People v. Napoles* (2002) 104 Cal.App.4th 108, 115.) "The 'continuous conduct' rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them. [Citation.]" (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100.)

We agree with respondent that no unanimity instruction was required for the charge in count 4. We find instructive *People v. Dieguez* (2001) 89 Cal.App.4th 266 (*Dieguez*).

In *Dieguez*, the defendant was convicted, in part, of one count of making a false material statement in support of a workers' compensation claim. (*Dieguez*, *supra*, 89 Cal.App.4th at pp. 270–271.) Although the charge was based on a series of false statements the defendant made during one particular medical visit, no unanimity instruction was needed because the statements "were successive, compounding, and interrelated one to another; they were all aimed at the single objective of obtaining workers' compensation benefits …." (*Id.* at p. 275.)

The same reasoning applies here. The amended information alleged that appellant made criminal threats to E.G. on February 26, 2013. During opening statements to the jury, the prosecutor stated that count 4 involved the "numerous threats" that appellant made to E.G. "while she was in the van when he was threatening her and what he would do to her family if she didn't have sex with him." During closing arguments, the prosecutor made it clear that count 4 was based on appellant's interactions with E.G. that same night when he had her in the van and was pressuring her for sex.[21]

---

[21]     Because the prosecutor made it clear to the jurors that this count was based on threats which appellant made to E.G., we reject appellant's assertion that the jury may have considered the threat he made to Yolanda as the basis for the conviction in count 4.

Appellant's threats, made to the same victim in a short period on the same night, were sufficiently closely connected in time and place as to form the same transaction. All of appellant's threats were aimed at the single objective of compelling E.G. to have sex with him. In order to convict appellant of making criminal threats, the jury had to agree unanimously that appellant's conduct that night satisfied the elements of the offense.[22] No unanimity instruction was required.

In his reply brief, appellant cites *People v. Salvato* (1991) 234 Cal.App.3d 872 (*Salvato*). In *Salvato*, the continuous conduct exception was deemed inapplicable in that case because section 422, which defines a criminal threat, does not contemplate a course of conduct over a period of time, but rather "an act taken at a particular moment in time …." (*Salvato*, at p. 883.) That case, however, dealt with the second category of the continuous course of conduct exception, and its facts are distinguishable from this case. In *Salvato,* the threats consisted of telephone calls to the victim on three separate days; a pretend shooting of the victim on yet another day; and gun receipts, newspaper articles, and letters sent to the victim on other days spanning a period of over a month. (*Salvato*, at p. 884.) Unlike appellant's threats here, the threats in *Salvato* were not so closely connected in time as to satisfy the first exception to the unanimity election rule. Appellant's reliance on *Salvato* is unavailing.

---

[22] The jury was instructed with CALCRIM No. 1300 regarding the elements necessary for finding appellant guilty of making a criminal threat in violation of section 422. The jury was told the People had to prove that (1) appellant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to E.G. or a member of her immediate family; (2) appellant made the threat orally; (3) appellant intended that his statement be understood as a threat; (4) the threat was so clear, immediate, unconditional and specific that it communicated to E.G. a serious intention and the immediate prospect that the threat would be carried out; (5) the threat actually caused E.G. to be in sustained fear for her own safety or for the safety of her immediate family; and (6) E.G.'s fear was reasonable under the circumstances.

45.

Based on this record, a unanimity instruction was not required for count 4. The prosecution based its theory of conviction on the criminal threats which appellant made to E.G. while he was with her in the van on the night of February 26, 2013. Those threats were so closely connected that they formed part of one transaction. Consequently, instructional error did not occur. In any event, we also conclude that any presumed error was harmless.

### 2. Any presumed instructional error was harmless.

There is a split of authority concerning the standard of review for failure to give a unanimity instruction. Some cases hold that the prejudice must be deemed harmless beyond a reasonable doubt under *Chapman*, *supra*, 386 U.S. 18. (*People v. Deletto* (1983) 147 Cal.App.3d 458, 473.) Others apply the standard articulated under *People v. Watson* (1956) 46 Cal.2d 818, 836, whether the defendant would have obtained a more favorable verdict had the unanimity instruction been given. (*People v. Vargas* (2001) 91 Cal.App.4th 506, 561–562.)

Even if instructional error occurred, any presumed error was harmless under either standard of review. "Where the record provides no rational basis, by way of argument or evidence, for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that defendant committed all acts if he committed any, the failure to give a unanimity instruction is harmless." (*People v. Thompson* (1995) 36 Cal.App.4th 843, 853, citing *People v. Deletto*, *supra*, 147 Cal.App.3d at p. 473.) Moreover, if a trial record indicates the jury resolved the basic credibility dispute against the defendant and would have convicted him of any of the various offenses shown by the evidence, prejudice does not exist for the failure to give a unanimity instruction. (*People v. Thompson*, *supra*, 36 Cal.App.4th at p. 853, citing *Jones*, *supra*, 51 Cal.3d 294, 307.)

In this matter, the prosecution presented overwhelming evidence that appellant made criminal threats to E.G. on the night in question. Based on the verdicts rendered,

the jurors necessarily resolved the credibility issues adversely against appellant, who was convicted on all counts. Thus, the guilty verdict rendered in count 4 was surely unattributable to any presumed instructional error. (See *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.) In other words, this presumed error was unimportant in relation to everything the jury considered on the issue of appellant's guilt. (See *Yates v. Evatt* (1991) 500 U.S. 391, 403, overruled on other grounds in *Estelle v. McGuire* (1991) 502 U.S. 62, 72–73, fn. 4.) We can declare beyond any reasonable doubt that any error was harmless. (See *Chapman*, *supra*, 386 U.S. at p. 24.) Accordingly, prejudice is not shown and reversal is not warranted.[23]

## V. Prosecutorial Misconduct Did Not Occur And Any Presumed Error Was Harmless.

Appellant raises a claim of prosecutorial misconduct. He contends the prosecutor's arguments during rebuttal shifted the burden of proof on the issue of consent. He argues he was denied due process and the right to a fair trial under the United States Constitution.

### A. Background.

During closing argument, the defense suggested that appellant and E.G. had been in a consensual sexual relationship. According to defense counsel, such a scenario raised reasonable doubt regarding appellant's guilt.

In rebuttal, the prosecutor told the jurors that they should use their common sense. The prosecutor asked the jurors to consider appellant's "claim that this relationship was consensual. Where's the evidence?" Appellant's trial counsel objected, claiming the prosecution was shifting the burden of proof. The trial court overruled the objection.

---

[23] Although we decline to reverse the conviction in count 4, we agree with appellant that his sentence in count 4 must be stayed pursuant to section 654. Appellant's criminal threats were the means of accomplishing the forcible rape in count 1. We address that issue below in section VI.

The prosecutor immediately reminded the jurors that the People have the burden to prove appellant's guilt, but the prosecutor noted that the defense had argued a consensual relationship existed. The prosecutor stated that the defense could have presented trial evidence if it desired. The prosecutor asked again, "where is the evidence of this consensual relationship?" The prosecutor discussed some of the evidence with the jury, which tended to suggest a consensual relationship had not occurred. A short time later, the prosecutor again asked, "Where's the evidence of a consensual relationship?" Appellant's trial counsel again objected, arguing the prosecutor's commented shifted the burden "to prove that there was consent." The court overruled the objection.

The prosecutor immediately asked again, "Where is the evidence of a consensual relationship? It does not—it has not been presented in this trial." The prosecutor asked the jury to consider whether it was credible that E.G., as a 17 year old, had engaged in a consensual relationship with appellant.

Later, the prosecutor said, "The fact that [E.G.] didn't remember whether they stopped for gas or not. The fact that [appellant] either got out of the van to urinate or make a phone call. How does that prove that this rape didn't happen? Minor inconsistencies." Appellant's trial counsel objected, stating it was not the defense's burden to prove that a crime did not occur. The court responded, "That's correct, counsel. It's the prosecution's responsibility." The court directed the prosecutor to continue. The prosecutor asserted to the jury that these inconsistencies "are not enough to show that there's reasonable doubt. They're minor inconsistencies regarding events that occurred over five years ago, and the fact that E.G. and C.G. don't remember every detail is not enough for you to find [appellant] not guilty because you should use your common sense, and you should consider the testimony that you have heard throughout this trial."

Later, the prosecutor discussed the photos of E.G. that were on appellant's cellular phone. The prosecutor asked the jurors whether it was "reasonable that this was consensual when there's no evidence that it was consensual?" Appellant's trial counsel objected that this shifted the burden for the defense to prove an element. The trial court overruled the objection.

## B.     Standard of review.

A prosecutor's actions violate the federal Constitution if it involves a pattern of egregious conduct that infects the trial with such unfairness as to deny due process. (*People v. Penunuri* (2018) 5 Cal.5th 126, 149.) Even if not fundamentally unfair, a prosecutor's conduct violates state law if it involves the use of deceptive or reprehensible methods in attempting to persuade either the trial court or the jury. (*Ibid.*) When the claim involves comments made by the prosecutor to a jury, "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

## C.     Analysis.

Appellant argues that the prosecutor's various comments to the jury constituted misconduct. According to appellant, the prosecutor "told the jury that it was the defense's obligation to prove consent rather than the prosecution's obligation to prove lack thereof." Appellant contends that "lack of consent" was a necessary element of proof in counts 1, 5 and 6, which were the charges involving the forcible rapes of E.G. Appellant insists that an inference may be drawn that E.G. had consented to the intercourse. He points to her trial admission that she had consensual intercourse with him on at least one occasion, and she showed an unwillingness to disclose the sexual relationship with her family and especially her mother. Appellant argues that this evidence "was a critical weakness in the prosecution's evidence with regard to the charges of forcible rape as to E.G." Appellant maintains that the prosecutor's comments

49.

improperly infringed on his right to remain silent under the Fifth Amendment of the United States Constitution. He concludes that the prosecutor's misconduct requires reversal of his convictions in counts 1, 5 and 6.

We find appellant's arguments unpersuasive. Before addressing them, however, we first discuss respondent's reliance on forfeiture, which we find unavailing.

### 1.     We decline to find forfeiture in this situation.

Respondent asserts that this claim is forfeited because "appellant did not request an assignment of misconduct and did not request that the jury be admonished to disregard the alleged impropriety." We decline to find forfeiture in this situation.

In general, a claim of prosecutorial misconduct is forfeited if the defense fails to object *and* request an admonition to cure any harm. (*People v. Caro* (2019) 7 Cal.5th 463, 510.) However, an exception exists if the objection and request for admonition would have been " 'futile or ineffective.' [Citation.]" (*Ibid.*)

Here, appellant's trial counsel lodged multiple objections, which the trial court overruled. Based on the trial court's responses, a request for admonition would have been futile or ineffective. As such, we agree with appellant that the forfeiture doctrine should not be applied in this situation. We will review appellant's claim. However, we find it meritless.

### 2.     The prosecutor did not commit misconduct.

Error occurs if a prosecutor (or trial court) comments, either directly or indirectly, upon a defendant's failure to testify in his or her defense. (*People v. Medina* (1995) 11 Cal.4th 694, 755.) However, the rule prohibiting comment on a defendant's silence "does not extend to comments on the state of the evidence, or on the failure of the defense to introduce material evidence or to call logical witnesses." (*Ibid.*)

Misconduct also occurs if a prosecutor states that a defendant has a duty or burden to produce evidence or prove his or her innocence. (*People v. Centeno* (2014) 60 Cal.4th

50.

659, 673.)  However, a prosecutor "can surely point out that interpretations proffered by the defense are neither reasonable nor credible." (*Ibid.*)  A prosecutor may make comments in rebuttal that would otherwise be improper if such comments "are fairly responsive to the argument of defense counsel." (*People v. Sandoval* (1992) 4 Cal.4th 155, 193.)

Here, the prosecutor did not comment, either directly or indirectly, upon appellant's failure to testify in his defense.  The prosecutor also did not state or even reasonably suggest that appellant had the burden to prove his innocence, or that appellant had a duty or burden to produce evidence.  To the contrary, appellant's trial counsel raised the possibility that E.G. had engaged in a consensual sexual relationship with appellant.  The prosecutor responded to that issue.  The prosecutor noted that the defense's position was not reasonable based on the trial record.  The prosecutor was permitted to point out that the interpretations proffered by the defense lacked credibility.  The prosecutor was also permitted to comment on the state of the evidence and the defense's failure to introduce material evidence.  (See *People v. Medina*, *supra*, 11 Cal.4th at p. 755.)

Based on this record, the prosecutor's comments did not result in a fundamentally unfair trial.  The prosecutor did not use deceptive or reprehensible methods to obtain the convictions.  Instead, the prosecutor responded to the defense's argument and asked the jurors to reject it because it lacked evidentiary support.  We conclude that it is not reasonably likely the jury construed or applied the prosecutor's remarks in an improper fashion.  As a result, misconduct is not present and reversal is not warranted.  In any event, we also determine that any presumed error was harmless.

### 3.	Any presumed error was harmless.

Even if we presume prosecutorial misconduct occurred, reversal is not warranted.  During rebuttal argument, both the prosecutor and the trial court commented that the

prosecution bore the burden to establish guilt. The court properly instructed the jury that the prosecution bore the burden to prove appellant's guilt beyond a reasonable doubt. The jurors were told that the court's instructions were to take precedence over any contrary comments by the attorneys. We presume that the jurors understood and followed these instructions. (*People v. Cain* (1995) 10 Cal.4th 1, 34.)

The evidence against appellant was overwhelming. Both victims provided testimony that conclusively established appellant's guilt on all charges. Based on the verdicts rendered, it is clear that the jury found the victims' testimony credible. Given the strength of the evidence against appellant, the prosecutor's relatively few remarks could not have prejudiced appellant. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1344 [finding prosecutorial misconduct harmless because the improper remarks were limited and the evidence of guilt was strong]; see also *People v. Leonard* (2007) 40 Cal.4th 1370, 1407 [finding misconduct harmless because "the prosecutor's passing remark could not have prejudiced defendant, given the overwhelming evidence of guilt"].)

Based on this record, we can declare beyond any reasonable doubt that any presumed prosecutorial misconduct was harmless. Even if federal constitutional error occurred, reversal is not required. (See *Chapman*, *supra*, 386 U.S. at p. 24.) Therefore, appellant's arguments are without merit and this claim fails.

## VI.    The Sentence In Count 4 Must Be Stayed Pursuant To Section 654; We Remand For Resentencing.

In count 1, the jury found appellant guilty of forcible rape of E.G., which allegedly had occurred on or about February 26, 2013. The trial court sentenced appellant to prison for 50 years to life, plus an additional five years. This sentence was consecutive to count 4.

In count 2, the jury found appellant guilty of kidnapping to commit rape, which allegedly had occurred on the same day as the rape above. The court sentenced appellant

52.

to prison for 14 years to life, plus an additional five years. This sentence was consecutive to count 4, but it was stayed pursuant to section 654.[24]

In count 4, the jury found appellant guilty of making criminal threats, which allegedly had occurred on the same day as the rape and kidnapping above. The court sentenced appellant to prison for an aggravated term of six years, plus an additional five years. This sentence represented the principal determinate term. When imposing this sentence, the court was silent regarding section 654.

Appellant maintains that, like the sentence in count 2, his sentence in count 4 must be stayed pursuant to section 654. He argues that his criminal threats were used to effectuate either the forcible rape in count 1 or the kidnapping done to commit the rape, and all of these crimes involved the same criminal intent and objective. He contends that these crimes were committed during "one continuous course of conduct with only one objective: to obtain E.G.'s compliance in an act of sexual intercourse." He notes that, during closing argument, the prosecutor argued that appellant " 'used fear of immediate injury' " to E.G. and her family " 'to get her to consent.' " Appellant asserts that E.G. agreed to have sex with him during the final incident because she feared for her daughter's safety.

In contrast, respondent argues it was proper for the trial court to impose punishment in both count 1 and count 4. According to respondent, appellant's threats were intended to keep E.G. with him and to facilitate the kidnapping. Respondent contends the trial court could have reasonably concluded that appellant had held multiple criminal intents. Respondent maintains the court acted within its sentencing discretion.

---

[24] The probation report recommended that count 2 be stayed pursuant to section 654 because the jury found true the special allegation of aggravated kidnap (§ 667.61, subd. (d)(2)), which elevated appellant's sentence in count 1 to a life term (*id.*, subd. (a)).

We agree with appellant and we reject respondent's arguments. Section 654 bars imposition of multiple punishments where one act or an indivisible course of conduct violates more than one statute. (*People v. Hester* (2000) 22 Cal.4th 290, 294.) The purpose of this protection is to ensure that a defendant's punishment is commensurate with his criminal culpability. (*People v. Capistrano* (2014) 59 Cal.4th 830, 886, overruled on other grounds in *People v. Hardy* (2018) 5 Cal.5th 56, 103–104.) Our Supreme Court has observed that if a defendant's offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, the defendant may be found to have harbored a single intent and only punished once. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

"A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618.) We must review the trial court's determinations in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

Here, the trial court did not analyze whether or not the crimes in count 1 (forcible rape of E.G.) and count 4 (making criminal threats) involved separate criminal objectives. Because the record shows a "course of conduct" rather than a single physical act, the trial court was required to consider appellant's intents and objectives. (*People v. Corpening* (2016) 2 Cal.5th 307, 311–312.) The court implicitly found appellant had held separate and independent intents and objectives, warranting consecutive sentences for his criminal threats in count 4 and his forcible rape in count 1. Substantial evidence does not support the court's implied finding.

On the night in question, appellant took away E.G.'s keys to the van when she was in a rural area. He made it clear that she had to have sex with him. When she refused, he

became angry and pushed her into the van. He told her "if you don't just let me, you know what's gonna [*sic*] happen."

Appellant made multiple threats to E.G., and he drove her to multiple locations. He threatened to wreck her van, and lock her inside and light it on fire. He told her that he had planted explosives at the house while he was visiting his children and he was going to "blow everybody up" if E.G. did not do what he said. She was scared. She told the jury that she believed appellant's threats because he was often violent and erratic. She did not want to be with him, but she told the jury that she had learned not to "fight it" when appellant acted like this. According to E.G.'s statements to law enforcement, she feared appellant would harm her daughter so she climbed into the back seat with appellant, and he had sex with her.

Appellant did not use force to facilitate this rape; instead, he relied on duress. He threatened E.G. and her family with harm if she did not comply with his demands for sex. Similar to kidnapping E.G. for the purpose of committing rape, appellant's criminal threats that night were the means of accomplishing or facilitating one criminal objective, i.e., having sex with E.G. against her will.[25] Substantial evidence demonstrates a single criminal intent. Thus, he cannot be punished multiple times. (See *People v. Latimer* (1993) 5 Cal.4th 1203, 1216–1217 [section 654 bars execution of sentencing on kidnapping count if kidnapping was done for the purpose of committing sexual offenses and the defendant was punished for each sexual offense].)

Based on this record, substantial evidence does not support the trial court's implied finding that appellant harbored multiple criminal objectives. Instead, appellant's

---

[25]    During closing argument, the prosecutor asserted to the jurors that appellant "used fear of immediate injury" to E.G. and her family "to get her to consent" for sex. We likewise note that, in arguing a unanimity instruction was not needed for the criminal threats in count 4, respondent takes the position that appellant's criminal threats, "as a whole, comprised an ongoing course of conduct with the single aim of forcing E.G. to have sex with him."

criminal threats in count 4 were the means of accomplishing his rape of E.G. in count 1. These crimes involved the same criminal intent. Thus, appellant may be only punished once. (See *People v. Harrison*, *supra*, 48 Cal.3d at p. 335; *People v. Latimer*, *supra*, 5 Cal.4th at pp. 1216–1217.) Accordingly, section 654 bars execution of the sentence in count 4. We remand this matter for resentencing.

## DISPOSITION

Appellant's sentence is vacated and we remand this matter for resentencing. The trial court shall stay the sentence in count 4 pursuant to section 654. Following resentencing, the court shall forward amended abstracts of judgment to the appropriate authorities. In all other respects, the judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:

MEEHAN, J.

DE SANTOS, J.